# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | David H. Coar | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 02 C 3789 | **DATE** | 12/3/2003 |
| **CASE TITLE** | Baird Credit Corp. v. Joseph A. Seher and Mary Beth Seher v. Baird Credit Corp. and Robert W. Baird, Inc. | | |

MOTION: [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

Plaintiff/Counterdefendant's and Third-Party Defendant's joint motion for summary judgment

## DOCKET ENTRY:

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due _____. Reply to answer brief due _____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m)  ☐ Local Rule 41.1  ☐ FRCP41(a)(1)  ☐ FRCP41(a)(2).

(10) ■ [Other docket entry]  For the reasons stated in the attached memorandum, the joint motion for summary judgment is granted in its entirety. BCC is granted judgment as a matter of law as to its breach of contract claims against the Sehers, and BCC and RWB are granted judgment as a matter of law as to the Sehers' claims against them. As set forth in the memorandum, the parties are directed to file a stipulation on or before January 2, 2004, or file simultaneous briefs on that date, concerning the total amount owed by the Sehers. This matter is set for status on January 20, 2004, at 9:00 a.m.

(11)  [For further detail see order attached to the original minute order.]

| | No notices required, advised in open court. | | | | **Document Number** |
|---|---|---|---|---|---|
| ✓ | No notices required, advised in open court. | | | | |
| | No notices required. | | number of notices | | |
| | Notices mailed by judge's staff. | | | | |
| | Notified counsel by telephone. | | DEC 0 4 2003 | | |
| | Docketing to mail notices. | | date docketed | | |
| | Mail AO 450 form. | U.S. DISTRICT COURT CLERK | docketing deputy initials | | |
| | Copy to judge/magistrate judge. | | | | |
| | | 03 DEC -3 PH 4: 18 | date mailed notice | | |
| aed/lc | courtroom deputy's initials | FILED-ED 10 | | | |
| | | Date/time received in central Clerk's Office | mailing deputy initials | | |

| | |
|---|---|
| **BAIRD CREDIT CORP.,** | ) |
| | )    **No. 02 C 3789** |
|         **Plaintiff,** | ) |
| | )    **HONORABLE DAVID H. COAR** |
|       **v.** | ) |
| | ) |
| **JOSEPH A. SEHER and MARY BETH** | ) |
| **SEHER,** | ) |
|         **Defendants, Counter-** | ) |
|         **Plaintiffs, and Third-Party** | ) |
|         **Plaintiffs,** | ) |
| | ) |
|       **v.** | ) |
| | ) |
| **BAIRD CREDIT CORP. and ROBERT W.** | ) |
| **BAIRD, INC.,** | ) |
| | ) |
|         **Counterdefendants and** | ) |
|         **Third-Party Defendant.** | ) |

## MEMORANDUM OPINION AND ORDER

The plaintiff, Baird Credit Corp. ("BCC"), filed a complaint against defendants Joseph A.

and Mary Beth Seher ("the Sehers"), alleging a breach of contract claim against each of them.

The Sehers subsequently filed counter-claims against BCC and third-party defendant Robert W.

Baird, Inc. ("RWB"), alleging breach of contract, breach of fiduciary duty, and violation of the

Wisconsin Uniform Commercial Code, Wisconsin Statutes 209.101, *et seq.* ("UCC").  On BCC's

and RWB's motion to dismiss the counter-claim and third-party complaint, respectively, this

court dismissed the breach of fiduciary duty claim for failure to state a claim and allowed the two

remaining counter-claims to proceed.

The parties' claims and counter-claims arise out of BCC's 1998 and 1999 loans to the

Sehers, which totaled $4.25 million.  The Sehers received the loan proceeds subject to the terms

of the Demand Promissory Notes and concomitant Collateral Pledge Agreements executed by them. Pursuant to the terms of the Notes, the loans were payable on demand. The Sehers provided stock to BCC as collateral to secure the loans. In early 2001, the loans became under-collateralized, and BCC demanded additional collateral. BCC and the Sehers sought to reach an agreement providing for the Sehers to pledge additional collateral to BCC, but they did not reach an agreement. In approximately August 2001, BCC demanded payment of the Sehers' indebtedness. The Sehers did not then or anytime thereafter pay the outstanding balance on the loans. The collateral stock became worthless in October 2001.

BCC's and RWB's joint motion for summary judgment in their favor on both BCC's claims against the Sehers and the Sehers' claims against BCC and RWB is now before this court. For the reasons set forth below, the motion is granted in its entirety.

## I. Summary Judgment Standard

At summary judgment, the court must view the facts in the light most favorable to the nonmoving party and draw all reasonable inferences in its favor. *See, e.g., Krehnavy v. Limagrain Genetics Corp.*, 294 F.3d 871, 875 (7th Cir. 2002). Summary judgment is appropriate if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); *Schuster v. Lucent Technologies, Inc.*, 327 F.3d 569, 573 (7th Cir. 2003) (quoting Fed. R. Civ. P. 56(c)). A triable fact issue exists "only if there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Schuster*, 327 F.3d 569, 573 (7th Cir. 2003) (quoting *Wade v. Lerner New York, Inc.*, 243 F.3d 319, 321 (7th Cir. 2001) (quotation omitted)).

2

The movant bears the initial burden of establishing that there is no genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 923, 91 L. Ed. 2d 265, 106 S. Ct. 2548 (1986). "Because the purpose of summary judgment is to isolate and dispose of factually unsupported claims," the non-movant must then present specific facts showing that there is an issue for trial. *Michael v. St. Joseph County, et al.*, 259 F.3d 842, 845 (7th Cir. 2001) (quoting Fed. R. Civ. P. 56(e)). To successfully oppose the motion, the non-movant cannot rest on the pleadings alone, but must designate specific facts in affidavits, depositions, answers to interrogatories, or admissions that establish that there is a genuine triable issue. *Celotex*, 477 U.S. at 324. A scintilla of evidence in support of the non-movant's position is insufficient to defeat a summary judgment motion; "there must be evidence on which the jury could reasonably find for the [non-movant]." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 2510, 91 L. Ed. 2d 202 (1986).

## II.     Factual Background[1]

### A.     The parties

BCC's principal line of business is the provision of financing to individuals with a high net worth and/or individuals who own "control" shares or restricted shares of stock and who are seeking credit for personal purposes to be secured by, among other assets, such securities. BCC is not a securities broker-dealer under state or federal securities laws and is not subject to

---

[1] The parties complicated the court's task by failing to comply with Local Rule 56.1 — specifically, by failing to provide proper record support for asserted facts and by responding to asserted facts with unsupported or otherwise improper denials. Of course, the court may, within its discretion, respond to these failures by disregarding the former and deeming admitted the latter. However, the court has instead "scoured" the record, and its disposition of the instant motion rests upon the undisputed facts (except to the extent otherwise noted).

regulation as a securities broker-dealer. The Federal Reserve is its primary regulator.

RWB is a registered broker-dealer under federal and state securities laws and is a member of the New York Stock Exchange and other principal exchanges. It is under the jurisdiction of the U.S. Securities and Exchange Commission ("SEC"), the National Association of Securities Dealers, and other securities industry regulators.

Neither parties' submissions makes clear the precise nature and/or contours of the relationship between BCC and RWB. What is clear is that they are related corporate entities: they maintain their respective principal offices at the same location, share some common staff and executive level personnel, and operate a single, common risk management committee.

Joseph A. and Mary Beth Seher are husband and wife. Mr. Seher founded NACO, Inc., which manufactured and sold products and component parts to users of rail cars and locomotives. NACO also manufactured and sold flow products to users in the petrochemical, pulp and paper, and waste water industries. Mr. Seher served as NACO's President and Chairman of its Board of Directors from 1985 until February 1999. He initially owned 95% of NACO's issued and outstanding shares and remained a principal shareholder of NACO when various NACO executives purchased shares over time.

In November 1998, NACO agreed to merge with ABC Rail, a supplier in the rail industry, which was a public company. The merger transaction was complete in February 1999, with ABC-NACO, Inc. the surviving entity. ABC-NACO's stock reached a closing high of $20/share on August 10, 1999.

Mr. Seher served as Chief Executive Officer of ABC-NACO from the effective date of the merger until approximately late March or early April 2001, at which time he left the

4

company. During that time, Mr. Seher and his family were the largest beneficial stockholders of ABC-NACO. The company filed a bankruptcy petition in October 2001.

### B. RWB's relationship with the Sehers, NACO, and ABC-NACO

RWB provided assistance to NACO in connection with its merger with ABC Rail. RWB, along with other entities, underwrote ABC Rail's subordinated debt (which became an obligation of ABC-NACO upon the merger).

The Sehers contend that RWB continued to provide financial advisory services to ABC-NACO up to and beyond the time of Mr. Seher's departure from ABC-NACO in March 2001. For example, they contend that RWB served as the underwriter for the sale of ABC-NACO's investment securities. They also contend that, in 2001 and up until October 2001, RWB was engaged to obtain Consent Solicitations, sell divisions of ABC-NACO, and raise capital through sales of common shares of stock. Finally, the Sehers allege that RWB's fees for such services were linked to its success in achieving ABC-NACO's objectives. BCC and RWB deny these contentions, generally, on the grounds that they are unsupported by the cited record evidence, but admit that RWB undertook one Consent Solicitation. It is undisputed that RWB was one of ABC-NACO's twenty largest unsecured creditors, as it held a claim of $817,663.89 as of ABC-NACO's October 2001 bankruptcy filing.

The Sehers maintained a joint brokerage account at RWB.

### C. BCC's lending relationship with the Sehers

#### 1. The loans

The Sehers entered into a lending relationship with BCC in December of 1998. BCC loaned the Sehers $100,000 in December 1998. BCC increased the loan amount to the Sehers by

$1.9 million in February 1999. The $1.9 million was extended at the time of the Sehers' purchase of a new residence on Astor Street in Chicago, Illinois. To obtain the $2 million loan, Mr. and Mrs. Seher each executed a Demand Promissory Note ("Note") in favor of BCC and a Collateral Pledge Agreement ("CPA"), both dated February 8, 1999.

In October 1999, the Sehers borrowed another $2.25 million from BCC. To obtain the loan, the Sehers each executed another Note in favor of BCC and another CPA, both dated October 12, 1999.[2]

## 2. The contracts executed in connection with the loans and their collateralization

By their explicit and unambiguous terms, the Notes required the Sehers to pay the outstanding principal balance of their loans, as well as accrued interest, upon demand. The Notes also required that the collateral securing the Sehers' debts to BCC be maintained at no less than a 200% collateral-to-debt ratio. Finally, the Notes made clear that they were secured by, and subject to the terms and conditions of, the CPAs executed in connection therewith.

The CPAs granted BCC a security interest for collateral purposes in stock owned by the Sehers. The CPAs required BCC to exercise reasonable care in the custody and preservation of the collateral in its possession, while also specifying that said duty did *not* include insuring or taking any steps to collect or realize upon the collateral or any distribution of interest or principal.

---

[2] The parties dispute whether the $1.9 million borrowed in February 1999 was used for the purchase of that home, for home furnishings and improvements, and for other personal purposes. Likewise, they dispute whether the $2.2 million borrowed in October 1999 was used for the purchase and renovation of a new residence for the Sehers on Dearborn Parkway in Chicago, Illinois, and/or for other personal purchases. These disputes are immaterial.

6

Additionally, the CPAs granted BCC the right to take various actions upon the Schers' default of their obligations under the Notes and/or the CPAs and to do so without notice or demand of any kind.[3] In pertinent part, they authorized BCC to liquidate the collateral upon the Schers' default of such obligations. However, by their terms, neither the CPAs nor the Notes *required* BCC to liquidate the collateral stock for any reason or under any circumstances. Rather, they provided BCC the option of doing so, as one of an assortment of remedies.

Likewise, the CPAs provided that the Schers could demand liquidation of the collateral stock, so long as they placed their demand in writing. Under the CPAs, BCC could nonetheless refuse to liquidate the collateral based on its sole opinion that so doing would adversely affect the value of the collateral, "*unless* the proposed sale plus other sums tendered by [the Schers], if any, will pay in full all Obligations, or substitute Collateral satisfactory to [BCC] is delivered to [BCC]." (Emphasis added). The CPAs also expressly provided that any refusal by BCC to dispose of the collateral, or any loss or damage to the collateral, would not affect the Schers' liability for their indebtedness.

## D.    The collateralization and eventual under-collateralization of the loans

The Schers initially pledged shares of NACO and, subsequently, of ABC-NACO, as collateral for their debt obligations.[4] At various times, BCC made additional requests for collateral in order to maintain the 200% collateral-to-debt ratio. Specifically, BCC made such requests when the loan amount increased, when the mortgage was released, and/or when the

___

[3] The CPAs also provided that BCC could waive any given default by the Schers without waiving any other subsequent or prior default by them.

[4] At some point, the Schers' debt obligation was partially secured with a home mortgage. However, as of June 2000, BCC had released the mortgage, and, from that point forward, the only collateral securing the Schers' loans was common stock in ABC-NACO.

market value of the ABC-NACO stock fluctuated.[5]

Prior to 2001, the Sehers responded to such requests by providing additional collateral to BCC. As of June 2000, the Sehers' collateral pledge totaled 1,906,857 shares of ABC-NACO stock. That amount did not thereafter change. Moreover, the Sehers did not make any payment on either Note after June 2000. At the time, the outstanding principal loan balance was $3,696,737.

The parties dispute the precise date on which the loans became under-collateralized (as measured by the contractually agreed upon 200% collateralization level). More specifically, they disagree as to the proper method for valuation of the stock. The Sehers contend that because the stock was "thinly traded," the stock could not have been disposed of on a single day and, instead, would have had to be sold over a period of time. Further, they contend that accrued interest, rather than simply the outstanding principal balance, should be factored into the analysis of when the loans became under-collateralized. Within that framework, the Sehers contend the loans were under-collateralized as of January 2001. BCC, on the other hand, contends that the loans became under-collateralized on March 30, 2001, when ABC-NACO's share price dropped to $3.00.[6] The parties agree that the loans remained under-collateralized from that time forward.

**E.     Events following the under-collateralization of the loans**

**1.     Undisputed facts regarding the parties' conduct**

---

[5] Although the Sehers purport to dispute the identity of the entity requesting additional collateral, they provide no record support for their denial, instead offering only the bare contention that representatives of RWB made the requests. This bare denial does not suffice to create a triable fact issue, and, in any event, this fact is not material.

[6] Although the precise date of the under-collateralization of the loans is immaterial, the record supports BCC's interpretation, as the contracts defined "fair market value" as the last sale price of the stock on the day of valuation.

8

After ABC-NACO's stock price dropped to $3.00/share, BCC demanded additional collateral from the Sehers. It also took steps to ascertain whether the Sehers could and would pledge an additional 600,000 shares from the Seher Family Limited Partnership ("FLP") as new collateral for the outstanding debt (which shares were held in an account at RWB). Thereafter, the parties engaged in negotiations aimed at reaching such an agreement. As late as September 2001, BCC believed that the Sehers were still working with their attorneys towards that end. Ultimately, the Sehers never pledged any additional collateral, notwithstanding BCC's requests for the same.

Nonetheless, BCC did not exercise its right under the contracts to liquidate the collateral it held. To the contrary, BCC retained the ABC-NACO stock as collateral and did not liquidate it. Likewise, the Sehers never requested or instructed, either orally or in writing, the liquidation of the collateral, as the contracts permitted them to do. Their attorneys did not do so either.

At some point in 2001, BCC demanded payment in full of the Sehers' indebtedness. BCC does not allege when this occurred, and the Sehers contend that it did not occur until August 2001. In any event, the Sehers never complied with BCC's demand, and BCC is currently out-of-pocket $3,696,737.14 in outstanding principal, as well as $694,420.14 in unpaid interest accrued as of May 31, 2003.

Many of the details surrounding the above undisputed facts are contested by the parties.

### 2. The parties' efforts to reach an agreement concerning the pledging of additional collateral and the Sehers' proposed condition of forbearance

In April 2001, BCC drafted a Guaranty of Account and Note Modification Agreement pursuant to which the Sehers would pledge the additional 600,000 shares from the FLP and

9

forwarded the same to Mr. Seher for his review and consideration. The parties subsequently engaged in some discussions concerning the pledging of additional collateral.

The Sehers instructed their attorneys to make a written proposal to BCC for the transfer of the 600,000 shares. Their forthcoming May 7, 2001 written proposal provided for the transfer of 600,000 shares from the FLP to BCC, and also provided for a forbearance, pursuant to which BCC would agree not to liquidate any of the shares held as collateral, whether old or new, until the earlier of: (1) the date on which a bankruptcy petition was filed by or against ABC-NACO; or (2) April 30, 2002.[7]

Ultimately, the parties never reached an agreement concerning the pledging of the additional shares, but the parties disagree as to why. The Sehers contend that BCC rejected its written proposal during a telephone conversation on May 8, 2001, for the expressed reason that applicable legal rules or requirements required BCC to liquidate the transferred shares upon 15 days' notice. BCC denies that contention.[8]

BCC maintains that the parties discussed a possible agreement during their phone call on May 8, 2001, and that, thereafter, it understood that Mr. Seher was working with his lawyers towards the end of achieving such an agreement. BCC contends that Mr. Seher consistently said that he had engaged lawyers who were working to ascertain whether such a transfer would be permissible, which the Sehers deny. Further, BCC contends that the Sehers never informed it

---

[7] Although the Sehers' Local Rule 56.1 statement implies that the forbearance they sought would pertain only to the "new" shares, their contention is directly contradicted by the express terms of the written proposal, as well as by the Sehers' other record admissions.

[8] Notably, a letter authored by Mr. Seher in November 2001 (following ABC-NACO's bankruptcy filing) posits the 15-day requirement as one imposed by the SEC and applying to the collateral already held in the event that no additional shares were pledged.

that their lawyers had concluded the 600,000 shares could not be pledged, which the Sehers also deny.

Although the Sehers contend that BCC rejected their written proposal on May 8, 2001, the Sehers admit that general discussions concerning the pledging of additional collateral extended beyond May 8th. Specifically, they maintain that Mr. Seher made "clear" to BCC from mid-May 2001 forward that he would consider the transfer of additional shares for collateral only if BCC agreed to a forbearance as set forth in the Sehers' May 2001 written proposal.

It is undisputed that, as late as September 2001, a BCC/RWB executive wrote a letter to Mr. Seher regarding his understanding that Mr. Seher would be meeting shortly with his lawyers to discuss the possible pledge of the additional 600,000 shares.

### 3. BCC's alleged representations that it was required to and intended to liquidate the collateral

As noted above, the Sehers admit that they never requested or instructed BCC to liquidate the collateral, either orally or in writing. Moreover, they do not allege that they wanted BCC to liquidate the collateral. However, they now contend that BCC made representations to the effect that it was going to liquidate the collateral.

Specifically, the Sehers contend that various BCC and RWB executives informed them on multiple occasions that BCC had legal obligations, as well as internal policies, requiring maintenance of collateral at levels different from that specified in the contracts. Moreover, the Sehers contend that, following Mr. Seher's departure from ABC-NACO, BCC informed their attorney that federal securities laws obligated BCC to increase the collateral-to-loan ratio because Mr. Seher was no longer an "insider" of ABC-NACO. They further allege that between mid-March and early May 2001, a BCC/RWB executive stated that "Baird" was legally obligated to

11

sell the ABC-NACO stock held as collateral and that those statements were never retracted.[9]

The Sehers allege that, in August 2001, Mr. Seher complained to a BCC/RWB executive about "the failure to have sold his shares of ABC-NACO" and that he repeated the complaint during a subsequent telephone conversation. BCC denies those allegations.

### 4. The reason(s) for BCC's decision not to liquidate the collateral

BCC presented evidence that Mr. Seher expressed a desire that the collateral not be liquidated and that, accordingly, it understood him to desire that the collateral not be liquidated. The Sehers' attorneys testified that they shared that understanding – in particular, that Mr. Seher wanted to hold onto the stock because he believed it would recover (i.e., increase in price).[10] Of course, the Sehers' written proposal for the transfer of the shares from the FLP contained the express condition that BCC not liquidate any of the collateral it then held or any of the additional collateral it would come to hold pursuant to the potential agreement. The November 2001 letter authored by Mr. Seher also expressly stated that he had sought an agreement from BCC "permitt[ing] a standstill for a period of time to allow for a recovery" in ABC-NACO's price and, in that vein, "even offered to attempt to use some of these [FLP] shares" as additional collateral. BCC thus presented evidence to support its contention that it declined to liquidate the stock because it chose to accommodate the Sehers' expressed desire not to sell the stock, with the

---

[9] It is worth noting that, in June 2001, Mr. Seher directed in writing how the ABC-NACO shares held by BCC should be voted. The Sehers admit that this fact directly contradicts any allegations that they thought the collateral had been liquidated between March 24 and May 15, 2001. The Sehers appear to have abandoned any such allegations.

[10] The Sehers' efforts to dispute this evidence by characterizing it alternatively as "inadmissible," "hearsay," and "irrelevant" are unavailing. Evidence concerning what the Sehers communicated and what BCC understood concerning how they wished BCC to exercise its rights under the contracts is admissible and is relevant to the Sehers' claim that BCC acted in bad faith under the contract.

understanding that the 600,000 shares from the FLP would be transferred if the Sehers' attorneys concluded there was no legal impediment to doing so.[11]

The Sehers purport to contest BCC's stated reason for not liquidating the stock, arguing that BCC declined to liquidate the stock to avoid harming the efforts of its affiliate, RWB, to carry out its work for ABC-NACO (*i.e.*, the sale of divisions of the company, sale of the company as an ongoing concern, negotiation of Consent Solicitations, *etc.*). Based solely on Mr. Seher's general experience regarding the implications of a fall in equity share prices, they argue that a "depressed market" for ABC-NACO shares would have rendered RWB's work more difficult. From that, they imply that BCC did not liquidate the collateral because doing so would have depressed the market for ABC-NACO shares, thereby hindering RWB's efforts on behalf of ABC-NACO and, in turn, adversely impacting its future fees from ABC-NACO.

In support of this argument, the Sehers also point to evidence that Northwestern Mutual Life Ins. Co. (allegedly "Baird's" parent company) sold its shares of ABC-NACO (which BCC contests without citing to the record) and that BCC did not liquidate the shares of ABC-NACO held as collateral in connection with another customer's loan account, notwithstanding that the loan was in default (which BCC admits). The Sehers do not make clear how these facts, if accepted as true, could support an inference that BCC did not liquidate the collateral stock in order to protect RWB.

In response to the Sehers' allegations in this lawsuit, BCC presented evidence that the individuals involved in making the decision not to liquidate the stock were not motivated by RWB's investment banking or market-making activities or fees or by issues of RWB's own stock

---

[11] Notwithstanding the relative importance of the issue, the Sehers interposed only an unsupported denial in response to this assertion.

ownership.[12]

## III. Analysis

Based on the parties' contractual agreement, Wisconsin law governs this court's disposition of their respective contract claims. As set forth below, BCC prevails as a matter of law and the Sehers fail as a matter of law on their respective contract claims because the Sehers have failed to adduce sufficient evidence to establish that BCC violated its good faith duty under the contracts. Moreover, the Sehers fail as a matter of law on their claim under the U.C.C. - foremost, because the provision under which the Sehers purport to bring their action does not support an independent claim for breach of the duty of good faith, and, in any event, for the same reasons that their contract claim fails.

### A. The Sehers' counter-claim for breach of contract against BCC and RWB (Count I)

The Sehers' counter-claim for breach of contract is premised on BCC's failure to liquidate the shares held by it as collateral in connection with the Sehers' loans. More specifically, the Sehers allege that BCC had a good faith obligation to liquidate the collateral after the loans became under-collateralized and after BCC allegedly stated that it would do so. The Sehers allege that, by failing to liquidate the collateral, BCC breached the covenant of good faith that is read into contracts in Wisconsin. *See, e.g., Market Street Assocs. Ltd. Partnership v. Frey,* 941 F.2d 588, 593-96 (7th Cir. 1991). Additionally, the Sehers allege that RWB should be held liable for BCC's breach as its alter ego.

The duty of good faith requires parties to a contract to exercise their discretion under the contract in a manner consistent with the parties' reasonable expectations. "'Good faith' is a

---

[12] In response, the Sehers offered only another unsupported denial.

compact reference to an implied undertaking not to take opportunistic advantage in a way that could not have been contemplated at the time of drafting, and which therefore was not resolved explicitly by the parties." *Market Street*, 941 F.2d at 595 (citation omitted). *See also* Wis. Stat. § 401.203. The duty is designed to protect parties to a contract from "arbitrary or unreasonable conduct." *Foseid v. State Bank of Cross Plains*, 541 N.W.2d 203, 213 (Wis. App. 1995) (internal quotations and citation omitted). Based on the undisputed facts, the Sehers cannot, as a matter of law, establish that BCC breached the duty of good faith by failing to liquidate the collateral.[13]

BCC and RWB correctly note that, as a general proposition, the good faith duty implied by Wisconsin law cannot substantively alter the existing terms of a contract or prohibit conduct that is authorized by the contract. *Super Valu Stores, Inc. v. D-Mart Food Stores, Inc.*, 431 N.W.2d 721, 726 (Wis. Ct. App. 1988). *See also Smith v. Rainsoft Water Conditioning Co.*, 848 F.Supp. 1413, 1417 (E.D. Wis. 1994) ("[u]nder Wisconsin law, there can be no breach of the implied covenant of good faith and fair dealing based on acts which are specifically authorized in the agreement").

There is a line of cases, beginning with *Estate of Chayka*, 176 N.W.2d 561 (Wis. 1970), that supports the proposition that even where a party technically fulfills its obligations under a contract, it may be found to be in breach of the covenant of good faith. *See also Interim Health Care of N. Ill., Inc. v. Interim Health Care, Inc.*, 225 F.3d 876 (7th Cir. 2000); *Wisconsin Natural Gas Co. v. Gabe's Construction Co.*, 582 N.W.2d 118 (Wis. App. 1988). However, these cases

---

[13] Contrary to the Sehers' contention, courts may resolve at summary judgment the issue of whether a party violated the covenant of good faith, assuming that the undisputed facts permit such a finding. *See, e.g., Smith v. Rainsoft Water Conditioning Co.*, 848 F.Supp. 1413, 1417 (E.D. Wis. 1994) (dismissing claim based on implied covenant of good faith and fair dealing at summary judgment).

make clear that such a finding is appropriate only where there is some evidence that the party, while in technical compliance, acted intentionally to defeat or evade the essence of the contract. *See also Original Great Am. Chocolate Chip Cookie Co. v. River Valley Cookies, Ltd.*, 970 F.2d 273, 281 (7th Cir. 1992) ("[t]he law...provide[s] a remedy in the name of good faith against opportunistic behavior, in the sense of behavior designed to change the bargain struck by the parties in favor of the opportunist").

On the undisputed facts, this is not such a case, and the law does not read into the contracts an obligation on BCC's part to liquidate the collateral. Here, the contracts specifically authorized BCC to decide whether to liquidate the collateral, as merely one of an assortment of remedies available to BCC in the event of the Sehers' default. The contingencies giving rise to this lawsuit – chief among them, the declining value of the collateral stock – were obviously contemplated by the parties. They drafted the contracts to grant to BCC absolute discretion to liquidate the collateral as one of an assortment of remedies and to grant to the Sehers the absolute right to liquidation under certain circumstances and the absolute right to request the same under any circumstances. Thus, the contract expressly provided both parties the right to "hedge" their bets with respect to changes in the market value of the collateral stock. In this case, both parties clearly hedged in favor of the possibility that the market value of the ABC-NACO stock would once again rise. After the stock instead became worthless, BCC exercised another of its contractual rights by seeking to recover through litigation. In light of these undisputed facts, the duty of good faith cannot be read to prohibit BCC from exercising its clear contractual rights as it did.[14]  *See Super Valu*, 431 N.W.2d at 726; *Smith*, 848 F.Supp. at 1417; *see also Market Street*,

---

[14] This is so regardless of whether BCC made the representations alleged by the Sehers regarding its "legal" obligation and intention to liquidate the collateral.  Relatedly, the Sehers' half-hearted

16

941 F.2d at 595.

Moreover, although the contracts granted to the Sehers a qualified right to effect the liquidation of the collateral, and an unqualified right to request the same, the Sehers never even requested liquidation of the collateral (either in the manner prescribed by the contracts or otherwise). Had the Sehers made such a request, BCC would have been contractually obligated to *liquidate the collateral* so long as the liquidation and/or the Sehers' provision of additional sums would have satisfied the Sehers' obligations under the Notes, or the Sehers provided satisfactory substitute collateral. BCC's good faith duty under the contracts did not require it to take an action that the Sehers opted not to pursue, themselves. That is, BCC's decision not to liquidate the collateral, in light of the Sehers' failure even to request liquidation, cannot be viewed as the type of "opportunistic" behavior proscribed by the duty of good faith. *See, e.g.,* *Market Street*, 941 F.2d at 595 (citation omitted).

Finally, even assuming *arguendo* that under the circumstances of this case, the law implied a good faith duty restricting BCC's exercise of its discretion in determining whether to liquidate, the Sehers' claim nonetheless fails as a matter of law. Construing the evidence in the light most favorable to them, they have not presented sufficient evidence to show that BCC breached any such duty. The Sehers do not allege that they wanted BCC to liquidate the collateral, and the undisputed record evidence establishes the contrary — the Sehers and their attorneys were attempting to negotiate an absolute forbearance by BCC. Even absent that evidence, it is undisputed that BCC understood or believed that Mr. Seher did not want the

"waiver" argument (*i.e.,* that BCC waived its right not to sell the collateral stock by representing that it would) fails because it was raised for the first time in response to a motion for summary judgment and, in any event, because it is not supported by compelling legal argument or authority.

collateral to be liquidated. These facts, both independently and in their totality, demonstrate that BCC's declining to liquidate the collateral was not "arbitrary or unreasonable" and did not breach the duty of good faith.

Finally, the Sehers' bare speculation concerning BCC's motives (*i.e.*, that it was motivated by a desire to protect RWB's fees derived from its provision of services to ABC-NACO) is insufficient to defeat summary judgment on their contract claim. *See, e.g., Borcky v. Maytag Corp.*, 248 F.3d 691, 695 (7th Cir. 2001) (speculation is insufficient to defeat summary judgment).

BCC is entitled to summary judgment in its favor on the Sehers' counter-claims against it for breach of contract. Therefore, RWB is also entitled to summary judgment in its favor on the Sehers' counter-claim against it in the capacity of BCC's alter ego (and this court need not address whether the Sehers presented sufficient evidence to support a finding that RWB was BCC's alter ego).

### B.    BCC's breach of contract claims against the Sehers (Counts I and II)

BCC's contract claims are premised upon the Sehers' non-payment of the principal and interest owed by them under the Notes, as well as their failure to keep the loans sufficiently collateralized. Under Wisconsin law, to prevail in its twin breach of contract claims against each of the Sehers, BCC must establish that: (1) a contract exists; (2) the Sehers' actions violate the express terms of the contract; and (3) the breach is material and resulted in injury. *Walgreen Co. v. Sara Creek Property Co.*, 775 F. Supp. 1192, 1195 (E.D. Wis. 1991).

BCC's ability to meet the first element of its claims against the Sehers is undisputed. The Sehers admit that they each executed the two Notes in favor of BCC (as well as the two

concomitant CPAs) in February and October 1999, respectively. Likewise, they admit that they received $4.25 million in loan proceeds, subject to the terms of the Notes and the CPAs. Thus, as a matter of law, BCC has established the existence of a contract.

BCC contends foremost that the second element of its contract claims against the Sehers is met by their failure to pay the amount owed by them upon BCC's demand for the same, which the express terms of the contracts required them to do.[15] Pursuant to the terms of the Notes, BCC lent the Sehers a total of $4.25 million and was entitled to payment of the outstanding principal balance of the loans, plus accrued interest, *upon demand*. The Sehers do not dispute that they failed to pay BCC upon demand or that their actions violated the express terms of the contract.

Likewise, based on the record evidence, the Sehers cannot adequately dispute BCC's ability to prove the third element of its claims. The Sehers undisputedly did not pay BCC the amount owed under the contracts upon BCC's demand for the same, which caused BCC to be out-of-pocket approximately $4,391,157.28. Thus, as a matter of law, BCC has established that the Sehers' material breach caused it injury.

In their opposition brief, the Sehers do not directly address, let alone set forth a defense to, BCC's contract claims against them. Instead, they affirmatively argue only that disputed fact issues preclude summary judgment in BCC's and RWB's favor on the Sehers' two claims against them (*i.e.*, for breach of contract and for violation of the U.C.C.). Construing the Sehers' brief in a charitable manner, their arguments in support of their own contract claim against BCC and RWB could be viewed as raising a defense to BCC's breach of contract claims – namely, that

---

[15] BCC also contends that the Sehers breached by failing to maintain adequate collateral and/or, relatedly, to pledge additional collateral upon request. However, given the court's finding that the Sehers breached by failing to pay the amount borrowed by them, it is not necessary to address this additional contention.

BCC may not recover under the contracts for the Sehers' alleged breach of contract because BCC, itself, breached the contract and thereby surrendered its right to enforce the contract against the Sehers.

However, as set forth in section III(A), *supra*, the Sehers' breach of contract claim against BCC fails as a matter of law. The Sehers have not raised any other barrier to BCC's recovery. BCC is therefore entitled to judgment as a matter of law on both its claims against the Sehers.

In light of the court's ruling on these claims, the parties are directed to file a stipulation as to the total amount owed by the Sehers under the contracts (including accrued interest) as of January 2, 2004, on or before that date. If the parties are unable to reach an agreement concerning the same, they are hereby ordered to file simultaneous briefs on the issue on January 2, 2004.

### C.     The Sehers' Counter-Claim for Violation of the Wisconsin Uniform Commercial Code (Count III)

In their initial pleading, the Sehers cited two provisions of the U.C.C. in support of their counter-claim under the statute – sections 9-610 and 9-207. However, as noted in this court's March 28, 2003 order granting in part and denying in part BCC's and RWB's motion to dismiss, section 9-610 does not obligate secured parties to dispose of collateral upon a borrower's default, but rather merely provides secured parties the option of doing so. In responding to the motion for summary judgment, the Sehers wholly abandoned their theories under both section 9-610 and section 9-207.

The Sehers now allege only a violation of section 1-203 of the U.C.C., which imposes a general obligation of good faith in the performance of contracts within the scope of the U.C.C. Setting aside the impropriety of alleging a theory for the first time in a brief opposing a motion

for summary judgment, the Sehers' claim, in its current incarnation, nonetheless fails as a matter of law.

The Sehers contend that there is no meaningful difference between the "good faith" obligation read into contracts under Wisconsin law and that prescribed by the U.C.C., and the Sehers do not address the issue. However, one critical difference is that section 1-203 of the U.C.C. does not support an independent cause of action for failure to act in good faith under a contract. *See, e.g., Hauer v. Union State Bank of Wautoma*, 532 N.W.2d 456, 464 & n.7 (Wis. Ct. App. 1995) (quoting official comment to § 401.203, STATS.) (section 1-203 does not support an independent cause of action for failure to act in good faith under a contract, but instead merely directs courts to "interpret[] contracts within the commercial context in which they are created, performed, and enforced"). The Sehers' counter-claim under the U.C.C. against BCC and RWB fails for this independent reason.

Even assuming, *arguendo*, that the Sehers could theoretically state a claim for relief under this section of the U.C.C., such a claim would fail as a matter of law for the reasons set forth in section III(A), *supra*.

## IV. Conclusion

For the foregoing reasons, BCC's and RWB's motion for summary judgment is granted in its entirety. BCC is granted judgment as a matter of law as to its breach of contract claims against the Sehers, and BCC and RWB are granted judgment as a matter of law as to the Sehers' claims against them.

In light of the court's ruling on these claims, the parties are directed to file a stipulation as to the total amount owed by the Sehers under the contracts (including accrued interest) as of

21

January 2, 2004, on or before that date. If the parties are unable to reach an agreement

concerning the same, they are hereby ordered to file simultaneous briefs on the issue on January

2, 2004.

**Enter:**

_David H. Coar_

**David H. Coar**
**United States District Judge**

**Dated: December 3, 2003**